## THE LYNDHURST.

(Circuit Court of Appeals, Second Circuit. May 24, 1906.)

### No. 207.

TOWAGE—INSECURE FASTENING OF HAWSER—LIABILITY OF TUG FOR NEGLIGENCE OF MASTER OF TOW.

Where a canal boat at the time she was taken in tow by a tug had a master on board who in accordance with the usual custom undertook to make fast the towline on such boat, the tug is not responsible for his negligence in performing such duty resulting in an injury to the tow through her going adrift by reason of the insecure fastening of the line and coming into collision with other vessels.

[Ed. Note.—For cases in point, see vol. 45, Cent. Dig. Towage, §§ 24-26.].

Appeal from the District Court of the United States for the Southern District of New York.

The cause comes here upon appeal from a decree holding the steamtug Lyndhurst responsible for damages done to her tow, the canal boat Philip Rafferty, which on March 13, 1897, was in collision with a car float lying at the pier foot of Gansevoort street, North river. The opinion in the District Court will be found in 129 Fed. 843.

J. K. Symmers, for appellant.
La Roy S. Gove, for appellee.

Before WALLACE, LACOMBE, and COXE, Circuit Judges.

LACOMBE, Circuit Judge. The District Judge thus briefly sets forth the circumstances of the collision:

"The boat [the Rafferty] had been lying stern out, light, outside of two other boats fastened on the upper side of Thirteenth Street [Pier] and was taken in tow there, about 7 o'clock in the morning by the tug, to be towed to Edgewater, N. J., for a load of coal, on a hawser, furnished by the tug and leading from her stern. [The tug had a barge on each side and therefore backed into the slip between 13th and 14th streets to pick up the canal boat.] The loop of the hawser was put by the master of the boat over her stern cleat, under directions from the tug, but it shortly afterwards slipped off, letting the boat go adrift and come in contact with the float, causing the damage complained of. The tide was ebb and the wind of some force from the northwest. The tug's liability turns principally upon the question whether she was negligent in making the boat fast. The libelant contends that the hawser was frozen and stiff and that it slipped off for that reason. Also that the tug was in fault in several other particulars, among them, that the tug failed to see that the tow was properly fastened and

permitted her to come in violent collision with a lighter. The claimant contends that the accident was wholly produced by the negligence of the master of the boat in that he did not properly fasten the hawser to his cleat."

As to the first allegation of fault the District Judge held that the weight of evidence shows that the hawser was not frozen. "The weather," he says, "had been cold, but not freezing, although by the weather records the thermometer got down to 30 degrees about 8 o'clock. Prior to that hour it had ranged from 45 degrees at 1 a. m. to 31 degrees at 7 a. m., and for the several prior days, the mean temperature was not under 45 degrees. I do not see, in view of the evidence, how the theory that the hawser was frozen can be sustained." In this conclusion we fully concur.

As to the liability of the tug he held as follows:

"I conclude that the accident was either due to the tug's omitting to see that the loop of the hawser was carefully put over the cleat, or to its being shaken loose by collision with the lighter, which was due to negligent towing."

The latter proposition may be first considered. The evidence is not satisfactory and presents many contradictions, which is not surprising in view of the circumstance that no testimony was taken until more than three years after the accident. The testimony was all taken by deposition and four years more elapsed before the cause was tried. The master of the Rafferty testified to two separate specific contacts before collision with the car float at Gansevoort Street Pier. He says that as the tug pulled him out of the slip he struck the spiles on the end of the Thirteenth Street Dock on the northwest corner of the dock. The witnesses from the tug insist that while the Rafferty was in tow she did not come in contact with this dock. The tide was a strong ebb, and there was a fresh breeze from the northwest. The tug was hauling the canal boat out stern first intending to take her over to the lee of the further shore, and there rearrange her in the tow for her destination. The canal boat started from her berth, about 20 feet inside of the end of the pier, and some 60 or 70 feet (the width of the two other boats) north of it. The hawser was about 20 or 25 feet and when the tug began hauling she (the tug) was heading diagonally across the river. Under these circumstances it might be that the effect of wind and tide before the tug got under full headway would bring the flotilla down so near the dock as to result in a contact between the spiles and the tow. But in that event, the stern being held up by the pull of the tug, the bow of the tow would tail with the tide diagonally across and down and the part brought into such contact would be the bow and perhaps some part of the port side forward. The master of the tow, however, testified positively both on direct and cross that he struck the spiles "about amidships, or maybe, a little forward of amidships, * * * on the starboard side." To do this his boat would have to be heading at least diagonally up stream, a position which she could not be in while the tug was towing her stern first, but which she would tend to assume if she were cast loose. In like man-

ner he testified that he came into contact with the lighter, which lay at the end of little Twelfth street, broadside to broadside, striking with his starboard side with the head up-stream. The chart shows that little Twelfth Street Pier lies a considerable distance inshore from the end of the Thirteenth Street Pier, and it is difficult to conceive any theory which will account for the tow reaching it while still attached to the tug. To do so the tug must immediately after starting for the Jersey shore have backed or stopped her headway, for no known or suggested reason. The narrative of the transaction given by the master of the Rafferty harmonizes· fully with the theory that the hawser slipped off before the first contact with the spiles. He admits that he did not know when it slipped; was busy with fenders to ease contact with the lighter when they called to him from the tug that the hawser was gone. How long it had been gone, he does not profess to know. The witnesses from the tug are positive that the tow made no contacts until after the hawser slipped; and, in our opinion, the clear weight of testimony is to that effect. Therefore, we cannot find the tug in fault for shaking the hawser loose by negligently allowing the tow to come into collision with the lighter or the spiles.

The cause of the collisions which the Rafferty sustained was failure to put the loop of the hawser carefully over the cleat. In that proposition we concur with the District Judge, but we cannot assent to the conclusion that the tug is to be held liable for that want of care. It is suggested that in putting the loop on his cleat the master of the tow was acting as the servant of the tug. We have already held that proposition unsound in a recent decision (Guinan v. Steam-tug Flushing [April 2, 1906] 145 Fed. 614.) It is also suggested that it is the duty of the tug to itself make fast the lines upon all vessels which it takes in tow. The authorities cited to support such propositions do not go to that extent.

In The Olive Baker, 4 Ben. 173, Fed. Cas. No. 10,489, the accident was caused, or promoted, by the breaking of a line which broke apparently because it had been slackened. The slackening had been done by the captain of the tow, and the tug was held responsible. But the evidence showed that the captain of the Olive Baker was cognizant of the slackening and slowed down so as to enable the captain of the barge to slacken it. The court held that the "Olive Baker, in undertaking to tow the barge, made herself responsible for any arrangement of the towing lines that was known to and acquiesced in by her. Whatever slackening of the line took place in this case was acquiesced in by the Olive Baker."

In The Pres. Briarly (C. C.) 24 Fed. 478, the tug was held in fault "in not seeing that the tow was properly made up, and secured with lines of proper strength. Half-inch lines, even new, are not sufficient for the securing together of large barges to be towed on the Mississippi river."

In The Sweepstakes, 1 Brown Adm. 509, Fed. Cas. No. 13,687, the court said:

"Undoubtedly. it was the duty of the tug to see that the line was securely fastened no matter what mode of fastening was adopted, and so as to hold

in all emergencies likely to happen whether ordinary or extraordinary, and the fact that it did not so hold is the best evidence that the duty was not performed."

The court, however, was dealing with failure to secure the end of the hawser which was attached to the tug. It said:

"I know of no safe rule other than to hold tugs responsible prima facie in all cases, for injuries resulting from the tow line slipping or giving way from its fastening upon the tug."

In The Quickstep, 9 Wall. 665, 19 L. Ed. 767, the court laid down the general rule:

"It was the duty of the tug, as the captains of the canal boats had no voice in making up the tow, to see that it was properly constructed, and that the lines were sufficient and securely fastened. This was an equal duty, whether she furnished the lines to the boats, or the boats to her. In the nature of the employment, her officers could tell better than the men on the boats what sort of a line was required to secure the boats together and to keep them in their positions. If she failed in this duty she was guilty of a maritime fault."

But the trouble in that cause arose from the parting of a line connecting one of the rear boats with the fleet and the subsequent breaking of a bridle-line which held the two forward boats together. The lines were not sufficiently strong.

In Pedersen v. John D. Spreckles Co., 87 Fed. 938, 31 C. C. A. 308, the accident happened because the towing hawser was fastened to the wrong bitt on the schooner. After referring to the authorities which had been cited and holding, in general language, that in the case of canal boats and barges, "which have no life, voice, or control in making up the tow," it is the duty of the tug to see that the lines of the tow are properly, sufficiently, and securely fastened, the court proceeds:

"But such cases have no application to a case like this, where the schooner had its own officers and crew on board, and, in pursuance of the custom in this respect, took full charge, management, and control in these matters. * * * The testimony shows, without conflict, that it is the custom, in all cases where the tow has its own officers and crew on board and in charge, for the officers of the vessel to arrange all the preliminary matters, such as placing, and making fast the towline. * * * The law applicable to this case is that both the tug and the tow must exercise reasonable care and skill. While the tug was bound to exercise reasonable care and skill, she had the right to expect corresponding care and skill on the part of the schooner."

The case at bar seems to come within these principles. It is true that the master and crew of the canal boat consisted of but one man, her master, but he was as well able to hitch the loop of a hawser over a bitt or a cleat as a dozen men would be. The witnesses for the libelant themselves testify that it is customary for captains of canal boats to fasten hawsers on their own boats. This being so it would seem to be an undue application of the general language of the authorities supra to require the tug boat to send a man on board each boat to fasten the towing line in the presence of a master who must be assumed to be competent to make it fast himself. We are satisfied that the several contacts of the tow happened, because the hawser

was not carefully adjusted by her master over the designated cleat, and that for his carelessness in that respect the tug is not liable.

The decree is reversed, with costs, and cause remanded, with instructions to dismiss the libel, with costs.